UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.      No. 20-CR-2124 MV

ABEL DARAMOLA,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Abel Daramola's objections to the Presentence Investigation Report. Doc. 167. The government filed a sentencing memorandum in response to Mr. Daramola's objections. Doc. 172. Having considered the briefs and relevant law, and being otherwise fully informed, the Court finds that Mr. Daramola's objection to the minor role adjustment pursuant to U.S.S.G. § 3B1.2 is overruled and his objection to the exclusion of the reduction under U.S.S.G. § 4C1.1 is sustained.

## BACKGROUND

On December 2, 2020, Joseph Oloaosebikan Olawuyi (a.k.a. Ibrahim Musa/Glenn Brown), Olutayo Sunday Ogunlaja, Gbemileke Bello, Adesuwa Renee Ogiozee, and Abel Adeyi Daramola were indicted in the District of New Mexico. The Indictment alleges that from approximately January 2016 through November 2016, Defendants knowingly, unlawfully, and willfully conspired to commit wire fraud, in violation of 18 U.S.C. § 1343, and aiding and abetting, in violation of 18 U.S.C. § 2. According to the Indictment, in January of 2016, Mr. Joseph Olawuyi used the online persona "Glenn Brown" to register on eHarmony.com. Doc. 1 at 3. Acting as "Glenn Brown," he began a romantic relationship with the victim, B.D., who was a resident of New Mexico. *Id.* He told B.D. that he was working to repair roads in Malaysia. *Id.*

1

Utilizing his story that he was stuck in Malaysia and needed money to get out, Mr. Olawuyi repeatedly provided B.D. with information for various bank accounts and requested that she transfer money to those accounts. *Id.* He also asked B.D. to send him gift cards. *Id.* The requests and transfers occurred as follows:

- January 25, 2016: Olawuyi requested that B.D. transfer $20,000 to a Maybank account in the name of Raidah Binti Tali and requested another $20,000 be transferred to a Maybank account in the name of Roziah Binti Pedlah. B.D. completed both requests and transferred a total of $40,000.

- February 1, 2016: Olawuyi requested that B.D. transfer $70,000 to a CIMB Bank account in the name of Lindone Enterprise. B.D. completed the request.

- February 8, 2016: Olawuyi requested that B.D. transfer $20,000 to a CIMB Bank account in the name of DJ Resources. B.D. completed the request.

- February 16, 2016: Olawuyi requested that B.D. transfer $20,000 to a CIMB Bank account in the name of Che Hasnah Binti Harun. B.D. completed the request.

- March 1, 2016: Olawuyi requested that B.D. transfer $10,500 to a Bank Islam Malaysia account in the name of Che Hasnah Binti Harun. B.D. completed the request.

- March 2, 2016: Olawuyi requested that B.D. upload $500 on an iTunes gift card for Glenn Brown.

- March 3, 2016: Olawuyi requested that B.D. upload $500 on an iTunes gift card for Glenn Brown.

- March 4, 2016: Olawuyi requested that B.D. transfer $15,500 to a TD bank account in the name of Christopher James Root. B.D. completed the request.

- March 8, 2016: Olawuyi requested that B.D. upload $500 on an iTunes gift card for Glenn Brown.

- March 9, 2016: Olawuyi requested that B.D. upload $500 on an iTunes gift card for Glenn Brown. Olawuyi sent B.D. the details of a bank account in the name of Olutayo Ogunlaja and said, "Honey don't forget that it has to be a cash deposit." Doc. 102 at 3. B.D. transferred $20,000 to an account in the name of Olutayo Ogunlaja.

- March 15, 2016: Olawuyi requested that B.D. deposit $20,000 into a Bank of America Account in the name of Olutayo Ogunlaja. B.D. completed the request. In March of 2016, Mr. Ogunlaja made multiple cash withdrawals and transfers to other Bank of America accounts, totaling $38,100.

- March 17, 2016: Olawuyi requested that B.D. upload $500 on an iTunes gift card for Glenn Brown.

- March 18, 2016: Olawuyi requested that B.D. transfer $20,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- March 22, 2016: Olawuyi requested that B.D. transfer $15,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- March 24, 2016: Olawuyi requested that B.D. transfer $10,500 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- March 31, 2016: Olawuyi requested that B.D. upload $300 on a Visa gift card for Glenn Brown.

- April 15, 2016: Olawuyi requested that B.D. transfer $20,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- April 19, 2016: Olawuyi requested that B.D. transfer $20,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- May 6, 2016: Olawuyi requested that B.D. upload $200 on a Visa gift card for Glenn Brown.

- May 20, 2016: Olawuyi requested that B.D. transfer $5,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- July 21, 2016: Olawuyi requested that B.D. transfer $20,000 to a TD Bank account in the name of Christopher James Root. He made a separate request for $30,000 to be transferred to the same bank account. B.D. completed both requests.

- July 26, 2016: Olawuyi requested that B.D. transfer $60,000 to a TD Bank account in the name of Alma Callaway. B.D. completed the request.

- July 28, 2016: Olawuyi requested that B.D. transfer $30,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- August 8, 2016: He requested that B.D. transfer $40,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- August 12, 2016: He requested that B.D. transfer $40,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- September 27, 2016: He requested that B.D. transfer $28,000 to a Woodforest Bank account in the name of Daramola Cars. B.D. completed the request.

- October 19, 2016: He requested that B.D. transfer $3,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- November 30, 2016: He requested that B.D. transfer $2,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

Doc. 1 at 3–9. In total, in response to Mr. Olawuyi's requests, B.D. transferred approximately $558,500 to various bank accounts. *Id.* Relevant here, in response to Mr. Olawuyi's request on September 27, 2017, B.D. wired $28,000 to Mr. Daramola's account in the name of "Daramola Cars." *Id.*

On October 27, 2023, the government filed a Motion in Limine to Admit 404(b) Evidence. Doc. 102. In that motion, the government sought to introduce three exhibits demonstrating the contents of Mr. Daramola's phone to show that Mr. Daramola knew that the money he received and transferred came from a fraudulent source. *Id.* at 11–12. The exhibits relevant to Mr. Daramola were filed as Docs. 103-6 ("Exhibit 6"), 103-7 ("Exhibit 7"), and 103-8 ("Exhibit 8"). Exhibit 6 contains 109 pages of text conversations between Mr. Daramola and 2347066357321@s.whatsapp.net from January 2018 through March 2020. The person with whom Mr. Daramola communicates frequently asks him for a bank account, often with certain characteristics—an account at a certain bank, a business or personal account, an account without online access, etc. Exh. 6 at 1, 11, 13, 17, 19, 22, 39, 41, 62, 69, 73, 97, 104, 106. Mr. Daramola provides account details for a bank account matching the request. *Id.* at 1, 20, 23, 60, 78, 81, 85, 87, 93, 98, 99, 101, 102. In two instances, the person refers to a romance scam. *Id.* at 83 ("that guy doing dating just called me now that his client has got her owo complete now. 100k"); *Id.* at 108 ("I need PNC bank . . . for dating payment"). Mr. Daramola also provided two accounts under his own name, including the same account used in the instant case. *Id.* at 20, 23. In one message, the other person asked Mr. Daramola for a "picture of front and back and the ssn you have." *Id.* 66.

4

Mr. Daramola also sent the person pictures of credit cards belonging to various individuals. *Id.* at 14, 15, 37. Exhibit 7 is a 344-page extraction from Mr. Daramola's phone in which he communicates with a person identified as "Odo." The conversations occurred between February 2018 and October 2019. Throughout the conversation, Mr. Daramola and Odo ask each other for accounts with specific characteristics. Exh. 7 at 1, 22, 28, 35, 54, 58, 61, 74, 81. In one message, Mr. Daramola considers providing the account information for Daramola Cars, the account he used in the instant case. *Id.* at 9. Odo and Mr. Daramola also mention "pickers," which refers to the individual involved in a large fraudulent scheme who is assigned the role of picking up the transferred cash at a bank or other outlet. *Id.* at 11, 16, 46. They also frequently discuss what percentage they can take out of the transfers for themselves. *Id.* at 19, 20, 48, 49, 279. In one message, Odo explicitly states that he has money coming in from "dating." *Id.* at 279. From the messages, it also appears that Odo and Mr. Daramola are working with outside third parties to coordinate the transactions. Exhibit 8 is a 51-page extraction from Mr. Daramola's phone which includes pictures of other people's passports and identity documents.

Mr. Daramola was arrested on September 12, 2022. He was released on December 14, 2022, after serving 94 days, or slightly more than three months, in custody. On April 17, 2024, Mr. Daramola pleaded guilty to Count 23 of the Indictment, charging him with Wire Fraud and Aiding and Abetting, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2. The Presentence Investigation Report ("PSR") calculated that his base offense level was 9 and his criminal history category was I, resulting in a guidelines range of 4–10 months in custody. As part of the calculation, Mr. Daramola received a two-level reduction pursuant to U.S.S.G. § 3B1.2(b) because of his minor role in the offense. Furthermore, despite having zero criminal history points, he did not receive a two-level reduction under § 4C1.1. The PSR determined that pursuant to § 4C1.1(a)(6), he was

ineligible for the reduction, because he had "personally caused" substantial financial hardship to the victim. Mr. Daramola argues first that he should have been assessed a four-level reduction for his minimal role in the offense pursuant to U.S.S.G § 3B1.2(a). He also contends that he should be eligible for the two-level reduction under § 4C1.1 because he did not personally cause substantial financial hardship on the victim.

## DISCUSSION

### I. Mr. Daramola played a minor role in the instant conspiracy and is entitled to a two-level reduction under U.S.S.G. § 3B1.2(b).

While the parties agree that Mr. Daramola played no more than a minor role in the instant conspiracy, Mr. Daramola argues that his role was minimal and that, accordingly, he should receive a four-level reduction. In particular, he argues that he was "far less involved in the scheme, was involved in far fewer transactions than his co-conspirators, and he received a much smaller share of the fruits of the crime." Doc. 167 at 1. The Court ultimately finds that Mr. Daramola acted in a minor, rather than minimal, role in the conspiracy and his objection is therefore overruled.

Where multiple people participate in an offense, U.S.S.G. § 3B1.2 provides a four-level reduction if an individual was a "minimal" participant and a two-level reduction if an individual was a "minor" participant. U.S.S.G. §§ 3B1.2(a), (b). A court may also apply an intermediate three-level reduction where the case falls between "minimal" and "minor." U.S.S.G. § 3B1.2. The Advisory Notes indicate that an individual may qualify as a "minimal" participant where they are "plainly among the least culpable of those involved in the conduct." U.S.S.G. § 3B1.2 cmt.4. In particular, an individual's "lack of knowledge or understanding of the scope and structure of the enterprise and the activities of others" may warrant a minimal role reduction. *Id.* A "minor" participant is described as one "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." *Id.* cmt. 5.

To determine whether an individual qualifies for any of the role reductions under § 3B1.2, the Guidelines require a fact-based inquiry that assesses the totality of the circumstances. *Id.* cmt. 3. The Guidelines indicate that courts should consider the following non-exhaustive factors:

> i) The degree to which the defendant understood the scope and structure of the criminal activity;
> ii) The degree to which the defendant participated in planning or organizing the criminal activity;
> iii) The degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
> iv) The nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
> v) The degree to which the defendant stood to benefit from the criminal activity.

*Id.* cmt. 3(C). Importantly, a mitigating role reduction is not barred even where a defendant played an essential or indispensable role in the offense. *United States v. Yurek,* 925 F.3d 423 (10th Cir. 2019) (reversing district court that denied a mitigating role reduction because the defendant's role was essential and holding that the court must look to whether the defendant was substantially less culpable than the average participant). It is the defendant's burden to show that he was substantially less culpable than the average participant. *United States v. Gault,* 141 F.3d 1399 (10th Cir. 1998).

In the instant case, there is no evidence that Mr. Daramola understood the scope and nature of the specific conspiracy charged in the Indictment. Nor is there any evidence that he had a role in planning or organizing the charged conspiracy, or that he exercised any decision-making authority over others. Furthermore, he only participated in one transaction and comparatively stood to make much less profit from the activity, as he engaged in a $28,000 transaction while the principal actor, Mr. Olawuyi, defrauded the victim of over $500,000. Nevertheless, the Rule 404(b) evidence submitted by the government demonstrates that Mr. Daramola had general knowledge of

the scope and structure of romance frauds and other international fraud schemes. The conversations in Exhibits 6 and 7 demonstrate that Mr. Daramola had a working knowledge of the different roles in international fraud schemes as well as the payout percentages distributed to different participants. It is particularly notable that in several messages, Mr. Daramola explicitly refers to "dating payments," indicating that he knew some of the money he received came from romance frauds such as the one perpetrated in the instant conspiracy. Thus, while Mr. Daramola may not have had knowledge of the scope of the instant conspiracy, his experience with other international fraud schemes suggests a level of general knowledge and a willingness to participate that is inconsistent with a "minimal participant." *See United States v. McColley,* 419 F. Supp. 2d 1310, 1314-15 (D. Kan. 2006) (defendant's role was not minimal where he had general knowledge of the structure and scope of drug trafficking schemes, even though he did not have knowledge of the scope of the charged conspiracy).

Nor is Mr. Daramola "plainly among the least culpable of those involved in the conduct." U.S.S.G. § 3B1.2 cmt. 4. Of course, Mr. Daramola, who was involved in only one transaction throughout the conspiracy, is substantially less culpable than Mr. Olawuyi, who was the main perpetrator of the fraud upon the victim and received hundreds of thousands of dollars as a result. However, three of Mr. Daramola's other co-defendants were also charged with acting as middlemen, with Mr. Ogunlaja receiving money twice, and Ms. Bello and Ms. Ogiozee each receiving money once. Since Mr. Daramola played the same role as three of his co-defendants and their actions are similarly culpable, he is not the least culpable of those involved in the conduct and therefore does not qualify for a minimal role adjustment. Accordingly, his objection is overruled.

## II. Mr. Daramola did not personally cause substantial financial hardship to the victim and is therefore entitled to a two-level reduction under U.S.S.G. § 4C1.1.

Under U.S.S.G. § 4C1.1, certain defendants with zero criminal history points are eligible for a two-level reduction of their base offense level. Although Mr. Daramola has zero criminal history points, the PSR found him ineligible for the reduction under §4C1.1(a)(6), which bars the reduction if the defendant "personally caused" substantial financial hardship. Mr. Daramola argues that § 4C1.1(a)(6) is not applicable to him, as he did not personally cause the substantial financial hardship to the victim in this case. The Court agrees.

U.S.S.G. § 4C1.1(a) provides that a defendant's offense level should be decreased by two levels if:

> (1) The defendant did not receive any criminal history points from Chapter Four, Part A;
> (2) The defendant did not receive an adjustment under §3A1.4 (Terrorism);
> (3) The defendant did not use violence or credible threats of violence in connection with the offense;
> (4) The offense did not result in death or serious bodily injury;
> (5) The instant offense of conviction is not a sex offense;
> (6) The defendant did not personally cause substantial financial hardship;
> (7) The defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
> (8) The instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);
> (9) The defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense; and
> (10) The defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848.

Relevant here, Application Note 1 states that "the application of subsection (a)(6) is to be determined independently of the application of subsection (b)(2) of §2B1.1."

Probation determined that Mr. Daramola "personally caused substantial financial hardship," and thus was ineligible under §4C1.1(a)(6) for the two-level reduction. The parties do

9

not dispute that B.D. suffered substantial financial hardship, as she lost over $500,000 during the course, and as a result, of the conspiracy. However, Mr. Daramola contends that the $28,000 he received does not constitute substantial financial hardship in comparison to the total amount of loss, and that he therefore is eligible for the reduction under § 4C1.1(a)(6). This argument is unavailing.

There is no question that $28,000, even on its own, would be a substantial loss to B.D., who was working as a teacher and at Cracker Barrel during the conspiracy. In her victim impact statement, B.D. informed the Court that, because of the money she gave to Mr. Olawuyi, she was unable to pay for her son's college, was not able to save for her post-retirement future, lost interest on her savings, and had to secure a loan for her current house. Although the total loss of $500,000 certainly magnified the impact to her savings and income, the $28,000 alone was sufficient to impact her retirement savings and her ability to pay for her son's education, as well as her ability to pay for her home. *See* § 2B1.1 Application Note 4(F)(iii) (in determining whether victim suffered substantial financial hardship, the court shall consider whether the victim suffered a substantial loss of retirement, education, or other savings).

Nevertheless, the Court finds that under the plain meaning of § 4C1.1(a)(6), Mr. Daramola did not *personally cause* the substantial financial hardship to the victim, and for this independent reason, he is entitled to the two-level reduction under § 4C1.1. Since there is no controlling Tenth Circuit law on this question, this is a matter of first impression. Ultimately, the Court finds that defendants personally cause substantial financial hardship only when they are directly involved in defrauding the victim, not when they act as middlemen in a fraudulent conspiracy.

When interpreting ambiguous language, "words will be interpreted as taking their ordinary, contemporary, common meaning" at the time Congress enacted the statute. *Hackwell v. United*

*States,* 491 F.3d 1229, 1236 (10th Cir. 2007). "Dictionary definitions can help us determine that ordinary meaning." *Medina v. Catholic Health Initiatives,* 877 F.3d 1213, 1225 (10th Cir. 2017). Merriam-Webster's Dictionary contains eight definitions for the word "personal," the most relevant of which is "done in person without the intervention of another." *"Personal,"* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/personal. The adverb "personally" refers to something done "in person," "as a person," "for oneself," or "in a personal matter." *"Personally,"* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/personally. The precise meaning and usage of the adverb "personally" may be best illuminated by its listed synonyms, in particular the synonym "directly." To do something in a direct way, or directly, is to do so "without an intervening agency or step." *"Direct,"* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/direct. Thus, the dictionary definitions indicate that to do something directly or personally is to do it without the intervention of another.

A review of other court's decisions in different contexts demonstrates that the ordinary meaning of someone who "personally caused" a harm is an individual who causes injury in a direct, uninterrupted manner. For instance, in *Torres v. City of Chicago,* No. 18-CV-2603, 2021 WL 392703, (N.D. Ill. Feb. 4, 2021), the district court held that two of the defendants in a 42 U.S.C. § 1983 action did not "personally cause" the constitutional violation. In *Torres,* the plaintiff filed a §1983 action against police officers who searched his home without a warrant and without his consent. The court dismissed the suit against two of the officers who searched the plaintiff's home because they arrived after the initial failure to obtain the plaintiff's consent to search his residence. *Id.* Even though those two defendants participated in the unconstitutional conduct, they did not *personally cause* the violation because they were not the initial officers on the scene who failed to

procure the plaintiff's consent to search. *Id.* In other words, they did not act illegally without the intervention of another, namely, the initial officers who failed to obtain consent to the search.

Similarly, in *United States v. Turner,* 551 F.3d 657, 666 (7th Cir. 2008), the court found that in order to violate the federal mail/wire fraud statute, "the defendant need not *personally cause* the mailing or use of a wire; it is enough that the use of mail or wire will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Id.* (internal quotations omitted). In drawing this conclusion, the court necessarily assumed that a defendant personally causes mail or wire fraud when they directly use the mail or a wire, in contrast to defendants who run businesses and routinely use the mails or a wire or have others complete the fraud for them. It appears, then, that the ordinary meaning of the term "personally cause" refers to direct actions, taken without the intervention of others or without any intervening steps.

As thus construed, Mr. Daramola did not personally cause the substantial financial hardship to B.D. It was Mr. Olawuyi, rather than Mr. Daramola, who approached B.D. in the first instance, commenced a fictitious "romance" with her and, taking advantage of that romance, requested that she transfer funds to him under false pretenses. It was only after this initial, intervening step that Mr. Daramola entered the scene, acting as the middleman whose sole job was to receive the money transferred by B.D. – money intended for, and requested by, Mr. Olawuyi. Under these circumstances and taking into consideration common language usage and legal authority, the Court is constrained to find that Mr. Daramola did not personally cause hardship to B.D., even if the hardship that she endured was reasonably foreseeable to him based on his experience with other international fraud schemes. *Cf. United States v. Bentley,* No. 22-400, 2024 WL 3796181, at *1 (S.D. Tex. Aug. 13, 2024) (finding defendant ineligible for two-level reduction under § 4C1.1(a)(6) because he had *personally defrauded* investors of at least $14,296,324).

Indeed, to interpret § 4C1.1(a)(6) otherwise would improperly render the statutory language, "personally cause," superfluous. *See United States v. Berry,* 717 F.3d 823, 837 (10th Cir. 2013) (J. Holmes, concurring) (internal quotations omitted) (applying canons of statutory interpretation to sentencing guidelines and noting that the court must "avoid construing a statute so as to render statutory language superfluous"). This is because defendants who, like Mr. Daramola, participate in fraud schemes, but are not necessarily the primary perpetrators of the fraud, are subject to enhancements under U.S.S.G. § 2B1.1(b)(2) where the overall offense caused substantial financial harm to the victim. As noted above, Application Note 1 for U.S.S.G. § 4C1.1 states that "the application of subsection (a)(6) is to be determined independently of the application of subsection (b)(2) of § 2B1.1." With this Note, the Commission expressed its intention that not all individuals who are subject to the § 2B1.1(b)(2) enhancement, simply by virtue of participating in an offense that caused substantial financial harm to the victim, also be made subject to § 4C1.1(a)(6). To effectuate the Commission's intention, the Court must give real teeth to the phrase, "personally cause," so that the applicability of § 4C1.1(a)(6) can be made independently of the application of § 2B1.1(b)(2). Conversely, to interpret everyone in a fraud scheme as having personally caused financial hardship for purposes of § 4C1.1(a)(6) would erase the independence between that provision and § 2B1.1(b)(2). For this additional reason, the Court finds that the phrase "personally cause" refers only to individuals who directly defraud or otherwise convince a victim to part with their funds, and does not extend to defendants like Mr. Daramola who, only after intervening steps by the primary perpetrators of fraud, come in and act as middlemen to further or complete the fraud that someone else began.

For these reasons, the Court finds that Mr. Daramola did not personally cause substantial financial harm to the victim. Accordingly, he is not foreclosed under § 4C1.1(a)(6) from receiving

13

the two-level reduction under §4C1.1. With the two-level reduction, his base offense level is 7. With a Criminal History Category of I, Mr. Daramola's guideline range is 0 to 6 months.

## CONCLUSION

Because Mr. Daramola's role in the instant conspiracy was minor, rather than minimal, his objection to the two-level reduction under § 3B1.2 is not well taken. Because Mr. Daramola did not personally cause substantial financial hardship to B.D., his objection to Probation's decision not to give him the two-level reduction under § 4C1.1 is well taken.

**IT IS THEREFORE ORDERED** that Mr. Daramola's objection to the minor role adjustment is **overruled** and his objection to the exclusion of the § 4C1.1 reduction is **sustained**.

**IT IS FURTHER ORDERED** that the PSR is hereby amended, consistent with this Memorandum Opinion and Order, to reflect the application of the § 4C1.1 two-level reduction, a base offense level of 7, and a guideline range of 0 to 6 months.

DATED this 19th day of September 2024.

_____
MARTHA VÁZQUEZ
Senior United States District Judge